2025 IL App (1st) 210186-U

FIFTH DIVISION
October 31, 2025

No. 1-21-0186

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2011 CR 1176501 |
| | ) | |
| GERARDO SERVIN, | ) | The Honorable William G. Lacy, and |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judges, Presiding. |
| | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held:*  We affirm the trial court's decision to deny defendant's motion for a new trial. The trial court did not abuse its discretion when it found that new evidence would not have changed the outcome at trial, the trial court's conclusion that trial counsel was not ineffective was not against the manifest weight of the evidence, and neither the admission of evidence regarding defendant's gang affiliation nor alleged prosecutorial misconduct warrant a new trial.

¶ 2                               I. BACKGROUND

¶ 3   On the evening of June 16, 2011, seventeen-year-old Miklo Santiago was shot and killed near the intersection of South Halsted Street and Canalport Avenue in Chicago. Gerardo Servin

was arrested in connection with the shooting, indicted by a grand jury, and charged with first-degree murder and aggravated discharge of a firearm.

¶ 4                                    A. State's Pretrial Motion

¶ 5        Before trial, the State filed a motion to admit gang crimes evidence, seeking to present evidence that on June 15, 2011, the night before the shooting, Servin "purposely sideswiped another vehicle that was driven by a member of the Ambrose street gang." The State noted that Servin was driving the same car he was seen driving on the night of Miklo's shooting, and that witnesses could identify Servin by his nickname "Lalo". The State argued that this evidence was relevant to show motive and explain why "this group of people was selected as to being the target of [Servin] back on June 16 of 2011." The State added, "We intend to show that prior to this date [Servin] had been a member of the Ambrose street gang, and that just within a few months prior to the actual shooting taking place, he had left the Ambrose street gang to join the Bishop street gang. **** Because of the animosity between the two groups, specifically also because of the fact that [Servin] had jumped one ship to join another, it's quite clear to show his intent to show his motive behind standing up for his new gang, to show respect for his new gang." Defense counsel objected to admission of the evidence, arguing that the State did not have to prove motive, and that the evidence was more prejudicial than probative.

¶ 6        The court allowed evidence of Servin's gang affiliation and of the gang-related car sideswipe incident that took place the night prior to the shooting. It found that the State "has shown a clear connection between the proper gang testimony and the offense," that "the evidence is relevant and highly probative" and that "the probative value far outweighs any prejudicial effect on the issue of motive and to explain an otherwise inexplicable act."

¶ 7                                    B. Servin's Jury Trial

¶ 8      The case proceeded to trial before a jury in June 2014. At trial, Michelle Rivera testified

that in June 2011, she lived with her boyfriend, Ignacio Cruz, who was nicknamed "Nuno" and a

member of the Ambrose gang. On June 16, 2011, she was driving around when Ignacio called her

and told her to pick up his friends Gregory Oleszkiewicsz (who was nicknamed "Taz"), Derek

Paige (who was nicknamed "Creep"), and Miklo, all of whom were Ambrose gang members.

Michelle picked them up in her sport utility vehicle, Derek got into the driver's seat, she moved to

the passenger seat, Miklo sat behind her, and Gregory sat behind driver's seat. As they were driving

north on Halsted Street and approaching the intersection with Canalport Avenue, the car died.

Derek got out and looked under the hood of the car but he couldn't restart it so he got back in the

car and Miklo and Gregory got out to push it west, back towards the intersection of Canalport and

Peoria Street. They called Ignacio and waited for a tow truck. Gregory got back in the car but

Miklo stayed outside the front passenger door.

¶ 9      Around 10 pm, a four-door gold Jeep pulled up right next to the driver's side of Michelle's

SUV, and the cars were facing the same direction. Although it was dark outside, there were street

lights on so Michelle could see inside the Jeep. She saw only one person in the Jeep, a Hispanic

male she knew as "Lalo." She identified Servin in open court as the man she knew as "Lalo." She

recognized him because Ignacio had pointed him out to her before. Michelle had seen Servin on

about four other occasions in the area where she lived, in the same gold Jeep or driving a tow truck.

When Servin pulled up in the Jeep next to her on June 16, 2011, she saw him pull a black gun, turn

his head to the right and extend his right arm out. After he pointed the gun in her direction, Michelle

ducked down and heard multiple shots, glass breaking, and the sound of bullets hitting metal. After

3

the shots stopped, she opened the passenger-side door and started running to her house, which was about three blocks away. She did not see what happened to the other guys in the car. As she was running, she heard more shots. When she got home, Ignacio was there. She told him what happened and then returned to the scene. Gregory and Derek were gone but the police were there, and she told them what happened.

¶ 10    Around 3:40 am the next morning, Michelle went to the police station and viewed a photo array. She was told that the suspect may or may not appear in the photo array and that she did not need to identify anyone. She identified Servin as the shooter. She returned to the police station on June 22, 2011, viewed a live lineup, and again identified Servin as the shooter. No one told her who to identify. Although Gregory and Ignacio were also at the police station, she did not talk with them about who to identify. Michelle said that although it was dark outside on the night of the shooting, she could still see Servin's face and that it was not obscured by the gun that was pointed at them. Servin was wearing a dark colored shirt, had facial hair, and was not wearing a hat.

¶ 11    Derek Paige testified next. At the time of trial, he was incarcerated for a 2013 burglary conviction. He had previously been convicted of armed robbery. He was friends with the victim, Miklo, and had known him since preschool. He had seen Servin a few times before around the Pilsen neighborhood and identified Servin in court as the man he knew as Lalo. On June 15, 2011, the night before Miklo was killed, Derek was driving a Chevy Cobalt and parking it when someone crashed into his car around 2 am. He couldn't remember if Ignacio was with him or not but Ignacio "might have" been with him. Derek denied being chased by anyone that night, and said he didn't see what kind of car crashed into him or who was driving the car that sideswiped his vehicle because he was intoxicated. After giving this testimony, Derek was confronted with his July 20, 2011, grand jury testimony about the June 15, 2011, incident where he said, "I was coming from

4

18th. Street. And I rode past some guy named Lalo. And then he started, he chased me" and then he "like side-swiped me." When he was asked during his grand jury testimony how he "kn[e]w it was Lalo that was in that car that chased [him]" Derek responded, "I saw his face. I saw him." At trial, Derek denied making these statements and said he didn't know if Servin was in a gang. When confronted with his grand jury testimony where he said Lalo "used to be an Ambrose and is now a Latin Bishop[,]" Derek denied making this statement.

¶ 12    Derek also testified about the June 16, 2011, shooting. He said that around 10:40 pm, he was out with Miklo, Gregory and David Reitz. Michelle came to pick them up, and after her car stalled, he, Miklo and Gregory pushed it to the corner of Canalport and Peoria because they were members of the Ambrose gang and wanted to get back to Ambrose territory. Ignacio called for a tow, and they got back in the car. Derek was in the driver's seat, and David, Gregory and Miklo were in the back. He heard shots from behind him, ducked down, and then heard multiple shots coming from the window on the driver's side of the car. He did not see the shooter. After the gunshots stopped, he ran to a friend's house and did not return to the scene. When he was confronted with his July 20, 2011, grand jury testimony about the night of the shooting, where he said that the shooter was "shooting towards [him]" and that the shooter's car was gold, Derek denied making those statements. He said that he didn't see the type of car that the shooter was in, and that he never said Lalo was the shooter.

¶ 13    Ignacio Cruz testified next. He admitted that he had been convicted of possession of a controlled substance in 2009. In 2011, he was living with his girlfriend, Michelle, and their son. He was a member of the Ambrose gang, whose territory stretched from Racine Avenue to Halsted Street and from Cermak Road to 18th Street. The territory of Ambrose's rival gang, the Bishops, was located just east of Halsted. On June 16, 2011, just before 10 pm, Ignacio called Michelle and

asked if she could give his friends a ride. She went and picked them up and he called for a tow truck a little while later when the car broke down. A short time later, Ignacio heard two sets of 5-8 gunshots. He ran outside, and Michelle was running towards him. She "looked like she was crying" and "kept saying Lalo, Lalo." She said, "he shot your friend. He's not breathing no more. He killed him." When Ignacio asked her who had been shot, Michelle said "Lalo killed Miklo. Shot him." Ignacio told Michelle to calm down and to go back to the scene.

¶ 14 Ignacio also testified that in the early morning hours of June 15, 2011, he was walking by Derek's house when he heard a sound like tires peeling out. He saw a Chevy Cobalt driven by Derek approaching at full speed. Ignacio then saw a tan beige Jeep Cherokee approaching with Servin in the driver's seat. Ignacio said he recognized Servin because "[h]e used to be from my neighborhood. One of my guys." He said Servin used to be in the Ambrose gang before he "left the gang and joined another gang." Ignacio then saw the Jeep sideswipe the Chevy Cobalt. Although Ignacio only saw Servin for a few seconds, he had known him for a few years so he recognized his face.

¶ 15 Ignacio was called to the police station to look at photos. On June 17, 2011, he pointed Servin out in a photo array and identified him again in a live lineup on June 22, 2011. Because Ignacio did not see the shooting, the photo array and lineup identifications were only to identify the person driving the car that sideswiped the Chevy Cobalt on June 15, 2011.

¶ 16 Gregory Oleszkiewicsz testified next. He admitted that he had been convicted in the past of driving on a revoked license, driving under the influence, and burglary, and that he had a pending felony case. He is a member of the Ambrose gang. On the evening of June 16, 2011, Michelle picked him up, and he drove with her, Miklo and Derek. The car stalled and they called Ignacio right away. They pushed the car because they thought it would be safer that way. Halsted

Street is the dividing line between Ambrose territory and Bishops territory, and they wanted to push the car back into Ambrose territory. They pushed the car into Ambrose territory and, as they were waiting for a tow truck, a gold tan SUV pulled up. There was a street light right there and it was a "well lit area." Gregory saw the driver of the gold tan SUV extend his right arm out from the driver's seat and shoot out the open passenger window. Gregory was able to "look into the face of the person that was shooting from the gold car" and identified Servin as the shooter. He had never seen Servin before that day. He heard "a lot" of shots, about 10-15, then took off running. When he testified before the grand jury, he said the shooter was shooting at Derek, who was running away.

¶ 17 On June 17, 2011, Gregory spoke to Detective Cato, viewed a photo array, and identified Servin as the shooter. On June 22, 2011, he went to the police station to do an in-person lineup and identified Servin again. On cross-examination, Gregory said the car that drove up was "a tan[n]ish, goldish, SUV. Maybe a Blazer or Cherokee." He also said that after the driver of the car pulled a gun and started shooting. the shooter got out of the car and "tried to gun [Derek] down." Gregory said that the shooter had a mustache and goatee and a dark-colored shirt, and that he "s[aw] the [shooter's] face and the gun. You know what I mean."

¶ 18 Officer David Ryan, a forensic investigator evidence technician with the Chicago Police Department, testified that he was working with his partner Eric Szwed on June 16, 2011. Around 11:30 pm, they went to the accident scene at the intersection of Canalport and Peoria and took videos and photos. These photos were admitted into evidence.

¶ 19 Sergeant Ernest Cato of the Chicago Police Department testified that he was the lead detective assigned to investigate Miklo's shooting. When he went to the area where the shooting occurred, he noted that it was illuminated by streetlights. He and his partner, Doreen Velsaquez,

7

took Michelle Rivera to the police station to interview her. During the interview, Michelle identified Gregory Oleszkiewicsz and Derek Paige as potential witnesses and said a person by the name of Lalo was the shooter. Cato assembled a photo array early on June 17, 2011. Michelle viewed the photo array and identified Servin as the shooter. Cato also conducted a photo array with Gregory, who identified Servin as the shooter as well. Derek Paige could not make an identification. Cato also interviewed Ignacio Cruz, who provided information about the car sideswipe incident involving Servin on June 15, 2011. When Ignacio was presented with a photo array, he identified Servin. Cato never told any of the witnesses who to identify. He attempted to locate Servin but was unsuccessful. After obtaining an arrest warrant, he arrested Servin on June 22, 2011. That same day, Ignacio, Michelle and Gregory returned to the police station to view an in-person lineup and all three identified Servin.

¶ 20    During cross-examination, Cato admitted that several individuals, including Rita Kleidon, were questioned at the scene, and others were brought to the police station to view photo arrays, but no one else identified Servin. Three people who called 911 – Fred Mayer, JP Thompson and Ruben Montiel – came to the police station but were unable to make an identification, and two others – Rita Kleidon and Derek Paige – were not cooperative in coming in to view a photo array or a lineup.

¶ 21    The parties stipulated that if called to testify, Morgan Creppel would testify that on July 20, 2011, he was employed as an Assistant State's Attorney and presented Derek Paige to a grand jury. When he asked Derek questions about what happened on June 15, 2011, Derek answered that Servin chased him and sideswiped him, and that he knew it was Servin because he "saw his face." Derek also testified before the grand jury that on the day Miklo was killed, he saw a gold car drive up, and after he started running away, "[l]ike seven" shots were fired at him. He did not see who

8

was in the gold car or who fired at him, however. Derek said that he was aware Servin was a member of a gang and that "[n]ow, he is a Latin Bishop."

¶ 22    The parties stipulated to testimony from Illinois State Police firearms expert Tracy Konior, who said that the 9 mm cartridges and 9mm/.38 caliber bullets/bullet fragments recovered from the scene were all fired from the same weapon. The parties also stipulated to testimony from Chicago police officer Eric Szwed, who was assigned to process the crime scene and administered a gunshot residue test to Miklo's hands, and to testimony from Ellen Chapman, a forensic scientist at the Illinois State Police Forensic Science Center, who analyzed the gunshot residue test from Miklo's hands and found no evidence that he had fired a weapon. Finally, the parties stipulated to testimony from Dr. J. Lawrence Cogan, who was employed as an Assistant Medical Examiner for the Cook County Medical Examiner's Office in June 2011. Dr. Cogan performed the autopsy on Miklo, and said he died from a single gunshot wound to the back, which caused extensive laceration to his heart. The State then rested its case.

¶ 23    The defense presented three witnesses to support Servin's alibi defense. Crystal Nevarez testified that in June 2011, she was in a relationship with Servin, and they lived together with their two children. She owned a gold Jeep Cherokee. On June 12, 2011, Servin was driving her Jeep when he was in an accident. She did not know what kind of damage the Jeep suffered because she never looked at it, and she never filed a police report. Servin had her car towed to a repair shop on June 13, 2011, and she picked it up after work on June 17, 2011. She paid for it with a check from her mother, and had to sign a receipt. Crystal said Servin did not come home on the night of June 16, 2011, because "[h]e said he was working." On cross-examination, Crystal said she gave the paperwork from the repair shop to Servin's attorney, but never gave it to police. At the time of trial, she was no longer in a relationship with Servin, but remained in contact with him. She talked

to him and then visited him in jail the night before she testified because Servin told her he wanted her to come see him.

¶ 24    Thomas Morano testified that his family owns a used car dealership and auto body repair shop called All Makes Auto Rebuilders. He had known Servin for several years, and said he personally did the bulk of the repairs on Crystal's Jeep. Morano remembered that the damage was to the left side of the vehicle, but admitted that the repair estimate prepared by his father indicated that all of the damage was to the right side of the vehicle. Morano said that Servin towed the Jeep to the repair shop and that Crystal was not with him. The vehicle was brought in on June 13, 2011, and picked up by Crystal on June 17, 2011. Morano was "100 percent" sure the Jeep was in his shop on June 16, 2011. On cross-examination, the State confronted Morano with the invoice for Crystal's Jeep, which provided detailed information including the name of the owner, the date the car was brought in, the license plate number, and the vehicle identification number. The State then confronted Morano with a number of invoices for other customers that were created around the date the invoice for Crystal's Jeep was created. Morano acknowledged that many of the other invoices were much less detailed; some were missing critical pieces of information like clients' last names and addresses, license plate numbers, VIN numbers, and the dates the vehicles were brought in for service or picked up.

¶ 25    Before the defense presented its last witness, the court admonished Servin. It asked him if he had an opportunity to speak with defense counsel about whether or not to testify, and Servin confirmed that he had. He informed the court he did not wish to testify, said that no one threatened him or promised him anything, and that the decision was made of his own free will.

¶ 26    The defense then presented its last witness, Allen Mendelson. Mendelson testified that he owned a towing business, and that he had known Servin for several years from working in the

towing industry and also "as a friend." On June 16, 2011, at around 7 pm, Servin pulled up in his driveway, so Mendelson invited him into his yard to have a beer. After they drank more than six beers together, Mendelson invited Servin to spend the night because he was so intoxicated. Servin slept on the couch and left the next morning. Mendelson heard from Servin a few days later when Servin told him the police were trying to accuse him of shooting a kid. Mendelson found out about a week later that Servin had been arrested. Mendelson did not go to the police, contact the state's attorney, or tell anyone that Servin had stayed over at his house on the night of the shooting because he was "busy with [his] own life" and "didn't think it was any of [his] business." On cross-examination, Mendelson admitted that he is still pretty good friends with Servin and that he visited him five or six times while he was incarcerated. The defense rested.

¶ 27    After closing arguments, the jury deliberated for less than three hours before finding Servin guilty of first degree murder and aggravated discharge of a firearm.

¶ 28                                C. Motion for a New Trial

¶ 29    On July 10, 2014, Servin, through trial counsel, filed a motion for a new trial. Servin then changed counsel, and his new attorney filed an amended motion for a new trial, alleging ineffective assistance by trial counsel for failing to interview witnesses Ina Reitz, David Reitz and Rita Kleidon, "whose testimony would have exonerated [Servin] at trial"; adequately communicate, share discovery, and inform Servin of all available defenses; and prepare Servin to testify at trial. The motion also alleged that trial counsel's "personal and professional" problems prevented him from effectively representing Servin. It stated, "on information and belief, trial counsel was arrested and charged with a D.U.I." while representing Servin at trial and failed to notify Servin that he was "the subject of a serious Attorney Registration and Disciplinary Commission [ARDC] investigation."

11

¶ 30    Servin submitted an affidavit, in which he said trial counsel never visited him in jail and only spoke to him briefly in the bullpen before court dates, failed to interview potential witnesses Ina Reitz and David Reitz even though he "begged him" to do so, dismissed his requests to put him on the stand, and never informed him that he had been arrested and charged with a DUI or that he was the subject of a serious ARDC complaint.

¶ 31    The defense attached an ARDC complaint to its motion, which alleged misconduct by trial counsel in a number of unrelated cases. The complaint was dated August 29, 2014.

¶ 32    The motion also alleged that new evidence consisting of "affidavits", which are actually unnotarized statements, from a number of witnesses, including Ina Reitz, David Reitz, Rita Kleidon and Jon Twist, warranted a new trial. These statements were prepared by defense investigator John Edward Byrne. The motion alleged that the testimony of Jon Twist alone would have changed the outcome at trial because it would have "totally impeached Michelle Rivera, the state's star witness." Servin also attached statements from Gregory Oleszkiewicz and Maria Rincon.

¶ 33    In her statement, Ina Reitz said that after she heard shots on the night of the shooting, she observed a cream colored, 4-door Chevy containing three young Hispanic men speeding past her. She saw the same vehicle circling the block three to four times that evening and four to five times in the days leading up to the shooting.

¶ 34    David Reitz said in his statement that on the night of the shooting, he heard gunshots as a beige, 4-door sedan pulled up next to Michelle's SUV. He then saw a guy standing at the corner of Peoria Street and Canalport Avenue, facing north, shooting at Derek Paige. The shooter was in his mid-twenties, approximately 5'6" tall, and weighed about 150 pounds. He said he was taken

to the police station after the shooting and that after hours of questioning, he finally "told the[] officers what they wanted to hear." He said he told police an "outright lie" to stop the questioning.

¶ 35     In her statement, Rita Kleidon said that on the night of the shooting, she looked out her window and saw a shooter standing near the passenger door of the SUV firing a handgun northeast toward Halsted Street. She said the shooter was "thin, between 5'9" and 5'10" tall," wearing a dark-colored shirt and a black baseball cap. She said she had a "clear, unobstructed view of the shooting as it occurred" and that she was "certain the *** young man firing the gun *** was the person who fatally shot" Miklo. She claimed she "told this along with everything [she] observed to the police officers who interviewed [her] outside [her] building on the night of the shooting."

¶ 36     In his statement, Jon Twist stated that he dated Michelle Rivera in 2005, and that after he was released from prison in October 2012, they got back together. Michelle told him that Ignacio "got her into some shit." After Miklo was shot, Ignacio told Michelle to tell the police that "Lalo" shot Miklo and that "Lalo" was driving a gold Jeep. Michelle also told him that "Lalo" had been a member of the Ambrose street gang, but that he quit.

¶ 37     In her statement, Maria Rincon said that on June 16, 2011, she and her boyfriend Pedro were driving Ignacio to the corner of Canalport and Peoria when they heard gunshots. When they arrived at the scene, they saw a young man on the sidewalk. Pedro called 911. At some point after Ignacio left the scene, his "baby mother appeared and said something to the effect that a man named 'Lalo' had been shooting."

¶ 38     In his statement, Gregory Oleszkiewicz said that Ignacio told him that Servin had supposedly left the Ambrose gang and joined the Bishops, a rival street gang, so Ignacio tried to turn Ambrose gang members against him. Gregory said that on the night of the shooting, a four-door Chevy Impala stopped next to the SUV he was in and started shooting. He then saw the

shooter get out of the car and start shooting at Derek Paige. The shooter was about 28 years old, 5'6" tall, with a small body, light skin, and a bald head. He said that at the police station, he "went along with the scam perpetrated by Ignacio" and told the police that Servin was the shooter and that Servin was driving a gold Jeep. He said that his "conscience has been bothering [him] for lying about Gerardo Servin being the shooter" and that he was "coming forward with the truth now" because he "did not want to see an innocent man go to prison for a crime he obviously did not commit."

¶ 39 In her statement, Michelle Rivera said that after her car broke down on the night of the shooting, a "regular sedan" that was "definitely not a gold Jeep Cherokee or an SUV" stopped on the driver's side of her car. She "didn't have an opportunity to see the occupants of the car" or "see a gun" because it all happened so fast. She told police she could not identify the shooter, "as she never saw the shooter" but said the police "forced" her to identify Servin. She said she did so because she was afraid the police would charge her with a crime if she failed to do so. She said she was telling the truth now because she did not want to see an innocent man go to prison as a result of her "wrongful testimony."

¶ 40 In response to Servin's motion for a new trial, the State argued that defense counsel's performance was not deficient. First, it noted that defense counsel was not required to put on any evidence on behalf of Servin, and yet presented three defense witnesses to support an alibi defense. Next, it argued that defense counsel's decision to present the testimony of three witnesses and not call others was a matter of trial strategy. In addition, it argued that even if defense counsel's communication with Servin was limited, it did not constitute ineffective representation. Finally, it argued that Servin's contention that trial counsel failed to inform him of his right to testify is belied by the record because Servin was admonished by the court and admitted that his decision to testify

14

was freely and voluntarily made. Turning to the issue of new evidence, the State argued that the majority of Servin's new witnesses were not new at all as they had already been available to the defense before trial. Moreover, it argued that any new evidence was unreliable and that even with this evidence, "no reasonable jury would have returned a finding of not guilty."

¶ 41                                    D. Hearing Testimony

¶ 42    On June 26, 2017, the court commenced an evidentiary hearing on Servin's motion for a new trial. It heard from additional witnesses on June 12, 2018.

¶ 43    Gregory testified that he had been a member of the Ambrose street gang since the early 90s and that after Miklo was shot, he spoke with police and identified Servin as the shooter. He admitted that he testified before the grand jury in 2011 and at Servin's trial in 2014, and swore to tell the truth both times. In January of 2015, he met with investigator Byrne, who said he was working on Servin's case, and they had a conversation about the night of Miklo's shooting. When asked if Byrne handed him a document to sign, Gregory said he didn't remember that. When he was shown the document purportedly prepared by Byrne, he admitted that his signature was at the bottom, but said he didn't recall signing it because he was "under the influence of PCP" at the time. Gregory testified that the statement prepared by Byrne was "false", that he did not tell Byrne the facts related in that affidavit, that "half of this stuff is ridiculous," and that there was a "lot of stuff" in there he "never even heard of." When asked if he told Byrne that the shooter was driving a four-door Chevy impala, Gregory said, "No, it was a gold Jeep Cherokee." He said, "all this stuff in here, none of this stuff is -- none of this stuff really happened." Gregory denied telling Byrne that Ignacio "urged [him] to identify Gerardo Servin", that he "gave in and went along with what Ignacio wanted him to say", that his "conscience had been bothering [him] for lying about Gerardo Servin being the shooter in this case", or that he was "coming forward with the truth now" because

15

he "d[id]n't want to see an innocent man go to prison for a crime he did not commit." Gregory confirmed that Servin was the person he saw shooting on June 16, 2011, and that Servin had been driving a gold Jeep Cherokee.

¶ 44    Maria Rincon testified that on June 16, 2011, around 10:30 pm, she was in her car when she got a call from Ignacio who said he needed a ride to his vehicle because it had died. When she picked Ignacio up, he "said that his baby momma [Michelle] had said that [Servin was the one who did the shooting]." They then heard additional gunshots. When they arrived at Ignacio's car, she saw Miklo, who was already dead. Ignacio left the scene and her partner Pedro Andratti[1] called 911. When police arrived, Maria spoke with them, but told them she did not see the shooting. Maria met with defense investigator Byrne twice in February of 2016, and they had a conversation about the night of Miklo's shooting. After the second meeting, Byrne presented Maria with a piece of paper and asked her to sign it. When asked if she signed it "because what was contained in that paper was true and accurate?" she responded, "Kind of sort of, yeah." When confronted with her statement, which said she heard Michelle say that Servin was the shooter, Maria said the affidavit was not completely accurate, because she never heard Michelle say that. Maria said she "told [Byrne] that that part [of the affidavit] wasn't true" and asked him to take it out, but he didn't.

¶ 45    Rita Kleidon testified that on June 16, 2011, she lived on the second floor of an apartment building near the scene of the shooting, and heard gunshots around 10:30 pm. When she looked out the window, she saw a dark colored SUV. Someone was firing next to the open passenger door of the SUV, towards Halsted Street. The person was about 5'9", wearing a dark shirt and a black baseball cap. After she called 911 and police arrived, she and her aunt Ina Reitz went downstairs to speak to officers on scene. She said she was never asked to go to the police station after speaking

---

[1] The police report and the State's answer to discovery identify him as Pedro Andrade.

with police or asked to view photos or a lineup. She was called by police about a month later, and answered more questions about the night of the shooting. About a year or two later, she was contacted by defense investigator Byrne, and she met with him several times. Bryne prepared an affidavit based on their conversation, and she signed it. When she was asked on cross-examination if there were trees outside her window, she admitted that there were, but said they did not obstruct her view of the shooting. After she was shown pictures of her kitchen window, she was asked about her phone call to 911, and whether she told the 911 dispatcher that she "couldn't see from [her] window." She denied doing so.

¶ 46    A stipulation about Rita's call to 911 was admitted, which indicates that on June 16, 2011, at approximately 10:41 pm, a woman said a kid was laying on the sidewalk dying on the side of the school. It said "c/s can't see from her window."

¶ 47    Michelle Rivera testified that on June 16, 2011, she was at home with Ignacio and her son when Ignacio got a call and asked her to go pick up Derek and Gregory. After she picked them up, her car stalled. A car pulled up next to them, but she "didn't get to see what kind of car it was." However, she said it was a "pretty small car," not a Jeep Cherokee. She also said she didn't see who was firing the gunshots and denied telling police that Servin was the shooter. She claimed she picked Servin out of the photo array at the police station because a detective told her "this is Lalo, he is the shooter." The detective told her she "needed to help him put [Servin] away or [she] could be charged with the murder of Miklo." She admitted that she gave a statement to the Assistant State's Attorney where she said Servin was the shooter and that she gave similar testimony before the grand jury, but said she did so because she was afraid the police would charge her with murder or they would not allow her to see her son again if she did not. In January of 2018, she met with Byrne and spoke with him about the night of the shooting. When she met with him a second time,

he presented her with a document he had prepared based on their conversation. She signed it and said it was accurate. On cross examination, when she was confronted with her grand jury testimony where she said she saw Lalo driving a gold Jeep and saw him pointing a gun at them, she admitted she was asked those questions and gave those answers under oath. She also admitted that when she was asked if anyone had threatened her or promised her anything to speak to detectives or view a photo array, she said no.

¶ 48    The defense presented no other witnesses. The State then called Detective Cato, who testified that he was working with his partner, Dorian Velasquez, on the night of the shooting. They interviewed Michelle and their conversation lasted about an hour. Michelle told them that a gold Jeep pulled up next to them on the night of the shooting and that "[a]n individual that she recognized pointed a gun in their direction. I believe the person she recognized was a person by the name of Lalo. She then -- When she saw the gun, she ducked down, heard shots. She exited the vehicle and fled, and she heard additional multiple shots at that point." No one else was there when they showed Michelle a photo array, no one coached Michelle or told her who to pick out, and no one threatened to take away Michelle's children if she did not identify Servin. Michelle identified Servin on her own, and identified him in a lineup several days later as well. Detective Cato also interviewed Maria Rincon after the shooting, and she told him she was not present at the time of the shooting but that Ignacio's girlfriend came up to her and said Servin was the shooter. Cato also interviewed David Reitz, who said he saw a beige car drive next to Michelle's car and someone fire multiple gunshots but didn't see who did the shooting. Cato said that each time he interviewed an individual about the shooting, they were interviewed alone.

¶ 49    The State then presented testimony from four additional officers. Officer Penny Szeto testified that Michelle approached her on the night of the shooting and told her a male Hispanic

18

named Lalo shot six or seven times at her car and that he was driving a gold Jeep. Officer David Ryan testified about evidence he recovered from scene, including bullet casings. Detective Joseph McCarthy testified about his interview with Rita Kleidon on the night of the shooting. He said Rita said she saw the shooting but did not say the shooter was a 5'9" person with a dark shirt and black cap and never described any cars. She said the shooter had a shaved head and that he was firing southeast. Detective Michael Hurley testified about his interview with Ina Reitz on the night of the shooting. She told him that she heard about 10 gunshots, then ran outside and saw a cream colored Chevy traveling eastbound on 21st Street towards Halsted. She could not see the occupants but had seen the car several times during the week prior to the shooting. Ina never described the vehicle's occupants or said she saw the car circling the block earlier that night.

¶ 50    ASA Chris Costello testified that he met with Michelle on June 29, 2011. She told him she had been treated well by police and never said she had been threatened or forced to make an identification by the police. He questioned Michelle before the grand jury, and a transcript of his questions and Michelle's answers was submitted to the court. He never made any threats or promises to Michelle in exchange for her testimony, and she never told him she was afraid her son would be taken away if she did not testify. Patrick O'Donovan, the Cook County State's Attorney's Office's investigator, testified that he interviewed Michelle as well, and said she never said she had been threatened by anyone.

¶ 51    The State explained that Servin's trial counsel could not be present for the hearing because he was rehabilitating from surgery, so a notarized statement was submitted on his behalf. In it, trial counsel said he filed a post-trial motion for a new trial and planned on supplementing it until he found out Servin had obtained new counsel. He reviewed all documentation provided in discovery, consulted with Servin on each court date, visited him at the Cook County Department of

Corrections and investigated information Servin provided related to the alibi defense that was presented at his jury trial. He spoke with Servin on each court date and answered Servin's questions "to the best of [his] ability." He said that "[t]hroughout [his] review of the discovery in this case, [he] was aware of Ina Reitz, David Reitz, Rita Kleidon, [and] Maria Rincon," as well as other witnesses who had called 911, including Fred Mayer, JP Thompson and Ruben Montiel. He explained that he attempted to interview David Reitz, but David had a pending felony at the time, so his requests to interview him to determine his credibility as a witness were declined by Reitz's public defender. He made additional attempts to locate and interview several other witnesses, but these attempts were unsuccessful or the witnesses were uncooperative, and his decision not to call others was trial strategy based on conflicting testimony with other witnesses or the physical evidence at the scene. He wrote, "I firmly believed we had a strong case in our alibi defense supported by multiple witnesses and documentation." He noted that he withdrew from representation of Servin on August 15, 2014, and said that because he was arrested for a DUI on August 26, 2014, and an ARDC complaint was filed against him on August 29, 2014, neither the DUI nor the ARDC complaint "played any role in how [he] handled or prepared for Mr. Servin's trial two months earlier." Trial counsel concluded by noting that he "discussed trial strategy with Mr. Servin including his right to testify" and that "at no time did we disagree on how to proceed."

¶ 52    The State also submitted documentation demonstrating that defense investigator Byrne was disbarred in 1996, and that his investigator's license expired on May 31, 2014, before he obtained the witness statements at issue in this appeal.

¶ 53                              E. Court's Decision

¶ 54    After hearing arguments from the parties, Judge William G. Lacy denied Servin's motion for a new trial. In its July 2, 2018, order, the court extensively reviewed the evidence presented by

20

the defense. First, the court noted that Gregory testified consistently with his trial testimony where he identified Servin as the shooter, said he told the truth at the grand jury hearing because he wanted justice for Miklo's family, and said it was a gold Jeep Cherokee that was involved in the shooting, not a gold or beige Impala. When he was questioned by defense counsel regarding a statement he allegedly made to defense investigator Byrne, Gregory said that he was forced to meet with Byrne, didn't really remember the meeting because he was under the influence of PCP, that the statement prepared by Byrne was false, and that "none of this stuff really happened." Byrne was never called to provide rebuttal testimony or to perfect the impeachment of Gregory.

¶ 55    Next, the court discussed Michelle's testimony where she said she "did not see the shooter" and that even though she ducked, she was "able to see that the shots did not come from a gold Jeep Cherokee." It also discussed her testimony where she said she previously identified Servin as the shooter because Detective Cato told her to do so and she had better go along with it or she would be charged with murder, and that she did so because she was afraid of losing her son. The court found Michelle's testimony was impeached by her prior inconsistent statements at trial and by her grand jury testimony, and that it was contradicted by Detective Cato's testimony. It found that her testimony was also contradicted by the statement of Jon Twist, who said Michelle told him she identified Servin as the shooter because Ignacio told her to do so, not because detectives threatened her. Finally, the court found that Michelle's testimony was contradicted by the testimony of Officer Szeto, who was at the scene after the shooting and testified that Michelle told her that "a male Hispanic named Lalo shot six or seven times at her car" and that Lalo was in a gold Jeep. The court noted that this conversation was initiated by Michelle, that Officer Szeto was not on scene as an investigator, and it found Officer Szeto's testimony "highly credible."

¶ 56    The court then discussed testimony from Rita Kleidon, who said that on the night of the shooting, she was at home and that when she heard gunshots, she went to her window and saw a person firing from the passenger side door of a dark-colored SUV. The shooter was 5'9" with a dark t-shirt and a baseball cap. She admitted that she called 911 to report the shooting, but denied telling the operator that she could not see from her window. The court found that Rita had been "severely impeached" by her prior statements to Detective McCarthy, where she provided a description of the shooter that differed greatly from her testimony at the hearing, and that she was also impeached by her 911 transcript, which reported, "woman said kid laying on sidewalk dying on side of school- said there are a lot of kids out there – c/s can't see from her window." The court found her description of the shooting was also contradicted by the physical evidence recovered from the scene.

¶ 57    The court then discussed the testimony of the defense's final witness, Maria Rincon. Although Rincon admitted that she met with Byrne, she said the statement he prepared was "kind-of-sort-of" correct and admitted that part of the statement was incorrect and should have been removed. The court found that this "hardly instills confidence in Ms. Rincon's testimony or the process used to obtain the statement."

¶ 58    The court noted that the defense had also attached "affidavits" from Ina Rietz, David Reitz, and Jon Twist, but none of them testified. It noted that these statements were not sworn to under oath, and although they were purportedly signed by Ina, David and Jon, no one came in to verify that they had signed. In addition, investigator Byrne did not testify even though he prepared these statements, and he was a disbarred attorney who was not even a licensed private investigator at the time he took the statements. Because there was nothing to prove up the authenticity of the

22

statements allegedly obtained by Byrne, the court found Ina, David and Jon's purported statements to be of "no evidentiary value."

¶ 59    After considering the "new" evidence presented, the trial court found that a new trial was not warranted. It also found that counsel's performance did not fall below reasonable standards. It noted that defense counsel called three witnesses and presented an alibi defense, and "could have only been informed of those witnesses and documents by [Servin] and his family." The court also found "absolutely no evidence" to support Servin's allegation that trial counsel was "distracted" and "did not have his mind on the case because of personal problems he was experiencing." It noted that it was only after Servin's trial that trial counsel was charged with DUI and that an ARDC complaint was filed against him. In addition, the court found Servin's allegation that trial counsel prevented him from testifying at trial was "meritless," noting that trial counsel expressly asked the court to admonish Servin at trial. Finally, the court found that trial counsel "was fully engaged during the course of [Servin's] trial." It "saw no evidence that [trial counsel] lacked concentration or was distracted by issues outside of trial" and noted that "[h]e was on time each day and prepared for trial." The court stated,

> "[Counsel's] trial performance and preparation were well above the standard set forth in *Strickland*. He thoroughly cross-examined the State witnesses. He presented an alibi defense supported by three witnesses and documentation. He presented cogent, logical arguments to the jury.
>
> [Counsel's] decisions regarding who to call or not to call were clearly strategic decisions. After some of the testimony I heard in this hearing, his decisions appear to be sound.
>
> [Counsel's] performance did not fall below an objective standard of reasonableness. The Court further finds that there was no prejudice to [Servin] so as to deprive him of a fair

23

trial. To the contrary, the Court finds [counsel] performed in a competent, professional manner throughout the proceedings."

The court found "no legal or factual basis" to grant Servin's motion for a new trial and therefore denied it.

¶ 60                              F. Motion to Reconsider and Sentencing

¶ 61    On July 31, 2018, Servin filed a motion to reconsider. He argued that the court's ruling failed to give proper consideration to Michelle Rivera's recantation testimony, to properly consider Gregory's "lengthy, written statement recanting his identification," and "improperly discounted" the testimony of Maria Rincon and Rita Kleidon. He also argued that the trial court discounted the statements of Ina Reitz, David Reitz and Jon Twist without proper analysis. In addition, Servin argued that conviction his must be vacated because "the testimony of Mr. Servin was promised to the jury but was not presented in support of his alibi," and "highly prejudicial and improper evidence" was admitted concerning "unsubstantiated, irrelevant gang activity" and a "prior bad act."

¶ 62    In response, the State argued that Servin "failed to present any valid legal or factual basis to set aside Judge Lacy's ruling" and instead, "asks that this Court toss aside the jurors' verdicts, Judge Lacy's ruling and allow him to re-litigate the charges he was convicted of for a third time." It argued that none of the statements presented by the defense should be afforded any evidentiary weight.

¶ 63    After Judge Lacy retired, Judge William G. Gamboney took over the case. He issued a written decision on the motion to reconsider on July 16, 2020. In it, he found that Servin's motion to reconsider "does not present newly-discovered evidence or changes in the law" and instead "asserts errors in Judge Lacy's application of existing law in his written ruling" and "inserts

24

arguments that were not included in the original or amended motion for new trial." He found that Judge Lacy's application of existing law was not erroneous, and that Servin was not entitled to a new trial. The court sentenced Servin to 45 years on the first degree murder charge, and a consecutive 4 years on the aggravated discharge of a firearm count. Servin timely appealed.

¶ 64                                    II. ANALYSIS

¶ 65     On appeal, Servin does not dispute that the State's evidence against him was sufficient to convict. Rather, he argues that the trial court erred in denying his amended motion for new trial and his motion to reconsider the denial of his motion for new trial, both of which were filed before he was sentenced and were based on newly-discovered evidence and ineffective assistance of counsel. He also argues that prosecutorial misconduct and the admission of gang crimes evidence denied him a fair trial.

¶ 66                              A. Standard of Review

¶ 67     "In general, a trial court's ruling on a motion for new trial will not be reversed absent an abuse of discretion." *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 130; *People v. Willmer*, 396 Ill. App. 3d 175, 181 (2009).

¶ 68                           B. Newly Discovered Evidence

¶ 69     Servin argues that the trial court erred when it denied his motion for a new trial based on newly discovered evidence. He argues that evidence obtained after trial, including the recantations of Michelle Rivera and Gregory Oleszkiewicz; the testimony of Rita Kleidon and Maria Rincon;

and statements given by Ina Reitz, David Reitz, Jon Twist, Adelphia Russell[2], Fred Meyer, J.P. Thompson, Ruben Montiel and Pedro Andratti, warrant a new trial.

¶ 70    To warrant a new trial based on newly discovered evidence, the evidence "(1) must have been discovered since the trial, (2) must be of such a character that it could not have been discovered prior to trial with the exercise of due diligence, (3) must be material to the issue and not merely cumulative, and (4) must be of such a conclusive character that it will likely change the result on retrial." *People v. Garcia,* 2023 IL App (1st) 172005, ¶ 49. "The decision to grant a new trial based on newly discovered evidence is within the sound discretion of the trial court and will not be disturbed absent a showing that the trial court abused its discretion." *People v. Harris*, 2020 IL App (5th) 160454, ¶ 52; *People v. Rudell,* 2017 IL App (1st) 152772, ¶ 38.

¶ 71    As an initial matter, Servin claims that statements from J.P. Thompson, Fred Mayer, Ruben Montiel, Pedro Andratti and Adelphia Russell were newly discovered, because he "had no access to the police reports and would not have known about these witnesses" before trial. However, Servin's trial counsel expressly stated in his affidavit that he was aware of "other witnesses who had called 911, including Fred Mayer, JP Thompson, and Ruben Montiel" and, in any case, all of the individuals Servin claims are newly discovered were identified as potential witnesses in the State's answer to Servin's discovery requests, which trial counsel stated he reviewed, undercutting Servin's contention. Moreover, although several of these witnesses were included in Servin's motion to reconsider, none of them were included in his original motion for new trial filed by trial counsel, or even his amended motion for new trial filed by posttrial counsel. Therefore, Servin forfeited any argument regarding proposed testimony from these witnesses and we will not

---

[2] The police reports and State's answer to discovery identify Adelphia Russell as Elizabeth Adelphia.

consider it. *People v. Bingham,* 75 Ill. App. 3d 418, 437 (1979) ("Generally, an issue will be considered waived if not raised in a post-trial motion for a new trial."); *People v. Teran*, 376 Ill. App. 3d 1, 4, 7 (2007) (noting that the purpose of a motion to reconsider is to bring to the court's attention "newly discovered evidence that was not available at the time of the first hearing" and not to raise "new legal theor[ies] or factual argument[s]").

¶ 72 Servin then claims that statements and testimony from Maria Rincon, Ina Reitz, Rita Kleidon and David Reitz were newly discovered evidence, because their statements "were not procured until after trial." However, all four witnesses had previously given statements to police and were identified as potential witnesses in the State's answer to Servin's discovery request, and Servin's trial counsel averred in his affidavit that "through [his] review of the discovery in this case, [he] was aware of Ina Reitz, David Reitz, Rita Kleidon, Maria Rincon." Therefore, even if Servin did not procure their statements until after trial, their testimony could have been discovered prior to trial with the exercise of due diligence. *Cf. People v. Molstad*, 101 Ill. 2d 128, 135 (1984) (finding that codefendants' testimony could not have been discovered with the exercise of due diligence because although the defendants were acquainted with one another, "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination *** if the codefendants did not choose to do so").

¶ 73 Even if we were to consider their statements, they are unlikely to change the result at a new trial. Maria testified that she did not see the shooting and admitted her statement was "kind of sort of" accurate, so her testimony fails to undercut the eyewitness testimony of Michelle and Gregory, who witnessed the shooting at close range and identified Servin as the shooter. Although Rita testified at the post-trial hearing that she looked out her window and saw a person firing from the passenger side of Maria's SUV who was much shorter and weighed much less than Servin, her

testimony conflicted with the previous description she gave to police on the night of the shooting where she did not provide a height, weight, or clothing description and merely said the shooter had a shaved head; with her 911 call, where she indicated that she "[could not] see from her window"; and with ballistics evidence recovered from the scene, which showed damage to the driver's side window, door and hubcap of the SUV and indicated that the shooter was firing from the driver's side of the SUV. For these reasons, the trial judge properly gave little weight to her testimony. See *People v. Williams,* 295 Ill. App. 3d 456, 464 (1998) (finding the trial court did not abuse its discretion when it denied defendant's motion for a new trial based on newly discovered evidence where two witnesses' testimony "that defendant was not the same body type as the shooters was inconclusive, as their statements were based on shadows and figures they observed from a considerable distance, and they were unable to positively identify any shooter in the incident"). In addition, the trial court properly found Ina and David's purported statements were of "no evidentiary value" because they were not notarized, were not otherwise witnessed, and neither one of them nor defense investigator Byrne (who prepared their affidavits) testified at the hearing as to their veracity. Without any indicia of reliability, the trial court properly gave no weight to Ina and David's statements. Likewise, the trial court properly gave no weight to Jon's statement and rejected Servin's contention that Jon's testimony alone would have changed the outcome at trial because it would have "totally impeached Michelle Rivera, the state's star witness" where Jon's statement was not notarized or otherwise witnessed, and neither Jon nor Byrne testified at the hearing.

¶ 74   Next, Servin argues that because the State's case "rested on the identification testimony" of Michelle and Gregory, Gregory's affidavit, in which he recanted his identification of Servin, "would at least cast a shadow over his original testimony." However, at the posttrial evidentiary

hearing, Gregory testified that the purported affidavit prepared by defense investigator Byrne was "false" and that "none of this stuff [included in the statement] really happened", and reaffirmed his identification of Servin as the shooter, consistent with his identification of Servin in the photo array, in the line-up, before a grand jury, and at trial. Accordingly, the trial court properly concluded that Gregory's testimony "was not recantation testimony" at all and that "any attempt to impeach [Gregory] with an alleged statement to an unlicensed private investigator was not proven up."

¶ 75    Finally, Servin claims that Michelle Rivera's recantation testimony at the posttrial hearing would have changed the result at trial. However, Michelle's testimony at the hearing – that she did not see the shooter and only said Servin was the shooter because a detective told her to do so – was impeached by her previous statements to police and by her testimony before the grand jury and at trial, and was contradicted by the purported statement of Jon Twist, who alleged that Michelle told him Ignacio was the one who told her to say that Servin was the shooter, not the police. Thus, we find no error regarding the trial court's determination that Michelle's recantation testimony was "incredible".  See *People v. Harris,* 2020 IL App (5th) 160454, ¶ 55 (because it has the opportunity to view live testimony, credibility determinations are "best left to the trial court"). Thus, Michelle's testimony would not have changed the outcome at trial. See *Williams,* 295 Ill. App. 3d at 465 (finding "no error with the trial court's finding that [a witness's] testimony lacked credibility" where the statements he made during the posttrial hearing "contradicted his own testimony and contradicted statements he had made to the police"); *People v. Caldwell*, 218 Ill. App. 3d 1007, 1010-11 (1991) (finding the trial court properly denied defendant's motion for a new trial when recantation testimony from an eyewitness was inconsistent with stipulated testimony about the nature of the victim's gunshot wound); *Harris*, 2020 IL App (5th) 160454, ¶

56 ("Considering [the witness's] generalized testimony, the evidence presented at trial, and the trial court's credibility determination, we cannot say [the witness's] testimony would probably change the result at a new trial.").

¶ 76    Taken together, the trial court did not abuse its discretion when it found that none of the testimony or statements from any of the witnesses identified by Servin was "of such a conclusive character that it w[ould] likely change the result on retrial." *Garcia,* 2023 IL App (1st) 172005, ¶ 49. Therefore, the trial court properly denied Servin's motion for a new trial based on newly discovered evidence.

¶ 77                              C. Ineffective Assistance of Counsel

¶ 78    Servin next argues that he received ineffective assistance of trial counsel because his trial counsel (1) failed to call witnesses and adequately investigate; (2) failed to call Servin as a witness even though he promised to do so in opening statements; (3) failed to use police reports and grand jury testimony to impeach the State's witnesses; (4) failed to call an eyewitness identification expert; (5) failed to object to the admission of gang crimes evidence; and (6) made comments during closing argument that improperly shifted the burden of proof and "guaranteed [Servin's] conviction". He claims that we should presume bias under *United States v. Cronic*, 466 U.S. 648 (1984), or, in the alternative, review his ineffective assistance claim under *Strickland v. Washington,* 466 U.S. 668 (1984).

¶ 79    We typically review ineffective assistance claims *de novo*. *People v. Boose*, 2025 IL App (4th) 231467, ¶ 43. However, if, as here, the trial court holds an evidentiary hearing and "has reached a determination on the merits of a defendant's ineffective assistance of counsel claim, we will reverse only if the trial court's action was manifestly erroneous." *People v. Tolefree*, 2011 IL

App (1st) 100689, ¶ 25. A "manifest error" is one that is clearly plain, evident, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 80    Servin claims that we should presume ineffective assistance here under *United States v. Cronic*, 466 U.S. 648, 659 (1984), which applies the presumption only where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" This presumption applies only when there has been a "complete deprivation of counsel." *Neder v. United States*, 527 U.S. 1, 9 (1999); *People v. Metcalf*, 202 Ill. 2d 544, 560-61 (2002); *Bell v. Cone,* 535 U.S. 685, 696 (2002) (to presume prejudice under *Cronic*, "the attorney's failure must be complete"). He argues that ineffective assistance should be presumed here based on the ARDC complaint and DUI charge against trial counsel. However, our supreme court rejected a similar argument in *People v. Szabo*, 144 Ill.2d 525, 529 (1991), where defendant asked the court to grant him a new trial based solely on trial counsel's problems with the ARDC. The court rejected defendant's request, noting that trial counsel did not even appear before the ARDC's Inquiry Board until ten months after defendant's trial, and instead analyzed defendant's ineffective assistance claim under *Strickland. Id.* at 530-31.

¶ 81    Similarly here, trial counsel was not charged with DUI, and the ARDC complaint was not filed against him, until several months after Servin's trial had concluded, so we fail to see how they have any bearing on the reasonableness of trial counsel's representation of Servin in this case. See also *People v. Smith*, 177 Ill. 2d 53, 88 (1997) ("declin[ing] to apply a *per se* rule that a defendant [should] be granted a new trial whenever his or her counsel is involved in proceedings

with the ARDC" and instead "review[ing] the defendant's claims under the *Strickland* ineffective assistance of counsel test").

¶ 82    Moreover, to presume bias under *Cronic*, trial counsel must have "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659. Here, the trial court expressly noted that trial counsel "thoroughly cross-examined the State witnesses ***, presented an alibi defense supported by three witnesses and documentation" and "presented cogent, logical arguments to the jury." We see no basis to reject the trial court's findings. Therefore, we will analyze Servin's ineffective assistance of counsel claim under the two-part test announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), adopted by our supreme court in *People v. Albanese,* 104 Ill. 2d 504 (1984).

¶ 83    Under the first part of this test, a defendant must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687-88. Under the second part of the test, a defendant must show that he was prejudiced by counsel's mistakes. *Id.* at 687. However, when reviewing ineffective assistance claims, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Decisions regarding whether to present particular witnesses are "within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel." *People v. Gonzalez,* 407 Ill. App. 3d 1026, 1038 (2011). "Errors in strategy do not constitute ineffective assistance of counsel" either. *Id.*

¶ 84                      1. Failing to Call Servin to Testify to His Innocence

¶ 85    Servin argues that his trial counsel was ineffective for failing to call him to testify to his innocence after telling the jury Servin would "take the stand" during opening statements. In *People v. Manning,* 334 Ill. App. 3d 882 (2002), the court addressed a similar argument. There,

defendant was charged with child abduction. *Id*. at 884. During opening statements, defense counsel told the jury that defendant would testify that he was concerned his wife was mistreating their child, and that because of his concern for his child's well being, defendant decided the child should not see her mother. *Id*. Defendant later informed the court that he did not wish to testify, however. *Id.* at 892. After he was convicted, defendant argued on appeal that defense counsel's "failure to provide the promised testimony 'destroyed' his credibility and resulted in ineffective assistance of counsel." *Id.* This court noted that "counsel's failure to provide promised testimony is not ineffective assistance *per se*" and instead, held that a defendant "must show that his counsel's decisions were unreasonable and that there was a reasonable probability his errors effected the outcome of the proceeding." *Id.* The court reasoned that because it "was not privy to discussions between defendant and his counsel" and it was not "clear from the record why defendant did not testify or whether he ever intended to testify," it would have to "presume [defendant's decision not to testify] was the result of trial strategy." *Id*. at 893.

¶ 86    Servin claims that he told trial counsel he "wanted to testify in his own defense," but this assertion is refuted by the record. The trial court asked Servin if he spoke with trial counsel about whether or not to testify, and Servin confirmed that he had. He then informed the court he did not wish to testify, and expressly stated that the decision not to testify was made of his own free will. Because the record reflects that Servin made the decision not to testify at trial after conferring with his counsel, we must presume, as we did in *Manning*, the decision was one of trial strategy. Therefore, trial counsel's performance was not deficient. See *People v. Briones,* 352 Ill. App. 3d 913, 919 (2004) ("if the defendant, contrary to defense counsel's previous assertion, decided not to testify at the trial, his counsel's performance was not deficient").

33

¶ 87    Even if counsel's performance was deficient, it did not affect the outcome of the proceedings. "The test is not whether defense counsel fulfilled all the promises he made during his opening remarks but, rather, whether defense counsel's errors were so serious that, absent those errors, the result of the proceeding would likely have been different." *People v. Schlager*, 247 Ill. App. 3d 921, 932 (1993). We find that trial counsel's comments during opening statements about Servin's anticipated testimony did not affect the outcome here, because this was not a close case. Two eyewitnesses at close range positively identified Servin as the shooter, and testimony from other witnesses and ballistics evidence corroborated their testimony. Although Servin's trial counsel attempted to undercut the eyewitnesses' testimony and presented an alibi defense on Servin's behalf, it was insufficient to undercut the strength of the State's case. *Cf. Briones*, 352 Ill. App. 3d at 921 (finding that defendant was prejudiced by trial counsel's failure to deliver on his promises that defendant would testify and by allowing the jury to be misinstructed where the evidence against defendant was not overwhelming and the State's case turned on the victims' identification of the defendant in low light, reasoning that based on "the aggregate errors of defense counsel, *** the verdict cannot be relied upon with confidence"). Due to the strength of the State's case, counsel's statements to the jury that Servin would testify in his defense had no effect on the outcome of his trial.

¶ 88               2. Failing to Adequately Investigate and Call Witnesses

¶ 89    Next, Servin argues that trial counsel failed to adequately investigate and call witnesses. "Whether to call certain witnesses *** [is a] matter[] of trial strategy, generally reserved to the discretion of trial counsel." *People v. Kidd,* 175 Ill. 2d 1, 45 (1996); *People v. Davis*, 228 Ill. App. 3d 123, 130 (1992) ("The decision of whether to call a witness is a tactical and strategical decision in which defense counsel is given wide latitude in making decisions."). While "[t]he

34

failure to interview witnesses may indicate incompetence, particularly when the witnesses are known to trial counsel and their testimony may be exonerating[,]" whether this failure amounts to incompetence "depends upon the value of the evidence to the case." *People v. Steidl*, 177 Ill. 2d 239, 256 (1997).

¶ 90    Servin argues that trial counsel "fail[ed] to interview and call nine potentially exculpatory witnesses." The record reflects, however, that trial counsel made efforts to interview each one of these witnesses or made strategic decisions not to call them. In his affidavit, trial counsel explained that he was aware of the State's potential witnesses through discovery, but did not call several of them due to their lack of cooperation or unavailability and chose not to call others because their testimony was contradicted by other witnesses or the physical evidence at the scene. The trial court found that trial counsel's "decisions regarding who to call or not to call were clearly strategic decisions" and added, "[a]fter some of the testimony I heard in this hearing, his decisions appear to be sound." We see no basis to reject the trial court's conclusion. None of the purported testimony from Servin's "potentially exculpatory" witnesses supported his alibi defense and statements by several of them – in which they provided descriptions of the shooter that did not match Servin – contradicted earlier descriptions they gave to the police on the night of the shooting and conflicted with ballistics evidence recovered from the scene. Based on the "wide latitude" afforded to attorneys in making decisions regarding whether to call certain witnesses (*Davis*, 228 Ill. App. 3d at 130), we find that trial counsel could have reasonably concluded that testimony from these additional witnesses would not have helped Servin's case. Therefore, we find that his failure to call these witnesses at trial was a discretionary decision based on trial strategy, and does not amount to ineffective assistance.

¶ 91          3. Failing to Subject the State's Case to Meaningful Adversarial Testing

¶ 92    Servin also argues that trial counsel failed to subject the State's witnesses to meaningful adversarial testing. "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). Because trial counsel's style of cross-examining a particular witness "involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court[,]" it will not constitute ineffective assistance unless the approach taken was "objectively unreasonable." *Id.* at 326-27.

¶ 93    Servin asserts that trial counsel "failed to use available evidence *** to discredit the State's witnesses' credibility and the State's theory that [Servin] was the shooter." However, the trial court noted that trial counsel "thoroughly cross-examined the State witnesses" and the record supports the trial court's conclusion. Trial counsel cross-examined each of the State's witnesses and elicited inconsistencies in their testimony in an attempt to discredit them. For example, Michelle testified that the shooter was driving a gold Jeep, whereas Gregory said the shooter drove a "tan[n]ish, goldish, SUV. Maybe a Blazer or Cherokee." In addition, trial counsel used cross examination to challenge the strength of their identifications, eliciting testimony from Michelle that "[i]t was dark out" and that she only saw the shooter for "a second or two" before she ducked down, and from Gregory that he only saw the shooter for three or four seconds before he started to run. Because the record reflects that trial counsel used cross examination to undermine the credibility of the State's key eyewitnesses, we find his performance was not deficient in this respect.

¶ 94                    4. Failing to Present an Eyewitness Identification Expert

¶ 95    Next, Servin claims that trial counsel was ineffective for failing to present an eyewitness identification expert at trial. However, a failure to present expert testimony on eyewitness

36

identification does not constitute *per se* ineffective assistance. In *People v. Elliott,* 2022 IL App (1st) 192294, ¶ 38, the court found that counsel's decision not to present expert eyewitness identification testimony was a matter of trial strategy where "nothing in the record demonstrate[d] that it was not[.]" The court noted that trial counsel "challenged the credibility of [a witness's] identification of [defendant]" through cross examination, and found that any potential expert testimony on eyewitness identification was "far too speculative to establish prejudice under *Strickland*." *Id.* ¶¶ 46-49. The same is true here. Trial counsel challenged the witnesses' identifications of Servin through cross-examination, and then during closing arguments, he highlighted the fact that the case hinged on two eyewitness identifications that were done at night, when there were "[n]o lights on in the cars," and the witnesses had only seconds to view the shooter. As in *Elliott*, any potential expert testimony here was "far too speculative to establish prejudice under *Strickland*." *Id.* ¶ 49.

¶ 96                          5. Failing to Renew Objection to Gang Evidence

¶ 97    Servin next argues that trial counsel was ineffective for failing to renew his objection to the admission of gang crimes evidence at trial. He argues that this evidence was inadmissible, improperly used for propensity purposes, and prejudicial. However, gang related evidence need not be excluded by the trial court "if it is otherwise relevant and admissible." *People v. Resendez,* 273 Ill. App. 3d 751, 757-58 (1995); *Campbell*, 2012 IL App (1st) 101249, ¶ 21 ("Evidence of a defendant's gang membership may be admitted if there is sufficient proof that it is related to the crime charged and is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect.").

¶ 98    The State sought to admit gang-crimes evidence regarding the car sideswipe incident that occurred the night before the shooting to explain why Servin shot at Miklo and other Ambrose

37

gang members the following night. "Although motive is not an essential element of murder, it is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to *** provide a motive for an otherwise inexplicable act." *Resendez*, 273 Ill. App. 3d at 758; *People v. Joya,* 319 Ill. App. 3d 370, 375 (2001); *People v. Rudd,* 2020 IL App (1st) 182037, ¶ 50 (quoting *People v. Smith*, 141 Ill. 2d 40, 56 (1990)) ("any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders [it] more probable that the accused did kill the deceased.")

¶ 99    The trial court properly admitted gang-crimes evidence here to show that Servin was motivated to target Ambrose gang members on the night of the shooting. See *People v. Colon,* 162 Ill. 2d 23, 30 (1994) (holding that the trial court did not abuse its discretion when it denied defendant's motion *in limine* to exclude gang-related evidence because the testimony "was clearly relevant to establish that the motive for the shooting was generally one of gang rivalry"); *People v. Williams,* 332 Ill. App. 3d 254, 265 (2002) (finding that gang evidence was properly admitted where the evidence "was not offered on defendant's character or to show a propensity to commit crime but, rather, to explain why defendant *** would be involved in an otherwise random and inexplicable shooting"). Here, the car sideswipe incident the night before was properly admitted to help explain what would have otherwise been a random or inexplicable murder. Therefore, trial counsel did not err when he failed to renew his objection to gang crimes evidence at trial.

¶ 100    6. Making Comments During Closing Argument that Shifted the Burden of Proof

¶ 101    Finally, Servin argues that trial counsel's statements during closing argument improperly shifted the burden of proof by "persuad[ing] the jury not to acquit [Servin], but to convict him." "Counsel's decision to argue a particular defense theory during closing argument is a matter of

trial strategy." *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004). "Counsel's choice does not constitute ineffective assistance simply because it was unsuccessful." *Id*. at 290.

¶ 102   When the challenged statements are considered in context, we find that trial counsel's strategy in closing argument – which consisted of attacking the credibility of the State's witnesses and contrasting their credibility with that of the defense witnesses – was a reasonable one. First, trial counsel reviewed the strength of the State's case. He noted that the State presented no physical evidence tying Servin to the shooting, and that only two witnesses "who were very very close friends and colleagues of the victim in this case" and had mere seconds to view the shooter were able to identify Servin, even though a third eyewitness who was closer to the shooter could not. He then discussed the testimony of the three witnesses presented by the defense, two of whom had "no social relationship" with Servin and testified that Servin's girlfriend's car was in the shop on the night of the shooting and that Servin was not present at the scene. Trial counsel concluded his argument by saying, "If you believe [Servin] was driving that car, find him guilty. **** But if you believe that our witnesses were subpoenaed to tell the truth and the car was not there, and [Servin] was at Mr. Mendelson's house on the evening of the 16th *** find him innocent." We do not find that trial counsel's comments – where he compared the testimony of State and defense witnesses – improperly shifted the burden of proof. In context, trial counsel was explaining the binary choice faced by the jury regarding the evidence before it, that is, whether to believe the State's witnesses or the defense witnesses.

¶ 103   Even if trial counsel improperly shifted the burden of proof in his closing argument, any error was harmless, as the jury was properly instructed that arguments of counsel are not evidence, that "the State has the burden of proving the guilt of the defendant beyond a reasonable doubt" and

that "the defendant is not required to prove his innocence." We presume the jury "follow[s] the instructions that the court gives it." *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 104   In sum, the trial court's conclusion – that trial counsel was not ineffective – was not against the manifest weight of the evidence. Therefore, we affirm the trial court's decision to deny Servin's motion for a new trial on this basis.

¶ 105                               C. Gang-Crimes Evidence

¶ 106   Servin next argues that the trial court erred when it admitted "without sufficient foundation, irrelevant and prejudicial" gang-crimes evidence over trial counsel's objection. While we normally review a trial court's evidentiary rulings for an abuse of discretion, Servin failed to preserve this issue by renewing his objection to this evidence at trial or in his motions for a new trial. See *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 19 ("To preserve an issue for appeal, a defendant must object at trial and raise the issue in a posttrial motion."). Therefore, we review for plain error, and will reverse only if we find error and "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). "The first step in conducting plain-error review is to determine whether error occurred at all." *Campbell,* 2012 IL App (1st) 101249, ¶ 20.

¶ 107   As discussed above, the trial court did not err when it admitted gang crimes evidence regarding the June 15, 2011, car sideswipe incident because it was admitted to provide motive for "an otherwise random and inexplicable shooting" the next night. *Williams*, 332 Ill. App. 3d at 265. There was sufficient foundation for this evidence based on Ignacio's testimony that Servin used to be "one of [his] guys" and a member of the Ambrose gang before he "left the gang and joined another gang" and Derek Paige's testimony before the grand jury that Servin "used to be an Ambrose [gang member] and is now a Latin Bishop." Moreover, any potential prejudice was

mitigated by the fact that the victim and the State's key witnesses were gang members as well and by the limiting instruction given to the jury regarding the use of this evidence. Although Servin argues that the limiting instruction given to the jury was "defective," he failed to object to the instruction at trial, forfeiting this issue. *Herron*, 215 Ill. 2d at 175 (quoting *People v. Ford*, 19 Ill. 2d 466, 478-79 (1960)) ("An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities"). Because Servin has not established error, let alone plain error, we honor his forfeiture.

¶ 108                                  E. "Prosecutorial Misconduct"

¶ 109  Finally, Servin argues that a number of the prosecutor's statements during closing argument amounted to "prosecutorial misconduct" and thereby deprived him of a fair trial. Servin did not raise this issue in his motions for a new trial, failing to preserve it for our review. See *People v. Wheeler,* 226 Ill. 2d 92, 122 (2007) ("To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion.") Servin acknowledges as much, but asks us to review for plain error, arguing both that the evidence at trial was closely balanced, and that the errors were so serious they undermined the fairness of his trial.

¶ 110  First, Servin argues that the prosecutor argued facts not in evidence when he stated that Derek did not identify Servin in court because he was afraid of Servin. While Derek did not expressly testify that he was afraid of Servin, "[a] prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper,* 234 Ill. 2d 173, 204 (2009). Here, the prosecutor's statements related to Derek's reluctance to identify Servin in open court were reasonable

inferences from the record, which shows that Derek identified Servin as the man who sideswiped his car in front of the grand jury (when Servin was not present), yet claimed he could not do so when facing Servin at trial. Moreover, because the trial court gave a limiting instruction after defense counsel objected to the prosecutor's remarks, instructing the jury that "any argument not supported by the evidence should be disregarded," any possible prejudice was minimized.

¶ 111   Next, Servin argues that the prosecutor misstated the evidence when he said "there are no other witnesses" besides those in Michelle's SUV that night. However, the jury heard there were other witnesses who were interviewed by the police. Even assuming the prosecutor's statement was inaccurate because other witnesses claimed they saw the shooting, we find no prejudice, as Servin presented no other eyewitness testimony to the jury to contradict Michelle and Gregory's positive identifications of Servin as the shooter.

¶ 112   Next, Servin argues that the prosecutor's statements improperly inflamed the passions of the jury by ridiculing the defense presented by Servin. However, prosecutors "may comment on the persuasiveness of the defense theory of the case as well as any supporting evidence and reasonable inferences drawn therefrom[.]" *People v. Abadia,* 328 Ill. App. 3d 669, 678-79 (2001). Moreover, if a prosecutor's remarks are "invited by defense counsel [they] will not constitute reversible error absent a showing of substantial prejudice." *Id*. at 678. Here, after trial counsel highlighted in closing arguments the testimony of the defense witnesses who said Servin's car was in the body shop at the time of the shooting, the prosecutor responded by pointing out the weaknesses in their testimony and the flaws in the supporting documentation provided by the defense. He asked the jury to "take a look at the documentation [provided by the defense] and how detailed it is" compared to other customers' invoices prepared around the same time and argued that the documents offered by Servin were "completely worthless to show that [Michelle's] car

was supposedly at [the auto shop] on June 16th." We find that the prosecutor's statements were reasonable inferences from the evidence presented to the jury, which shows that the invoice for Michelle's gold Jeep was much more detailed than those provided to Morano's other customers, suggesting the repair invoice for Michelle's gold Jeep was manufactured.

¶ 113 Finally, Servin argues that the prosecutor's attacks on defense witnesses – including calling Derek a "piece of work" and Mendelson "Mr. Responsible" – warrant reversal. However, the prosecutor's comment about Derek was made in response to statements by trial counsel during closing arguments, where he attempted to undercut the credibility of Gregory and Michelle's identifications of Servin as the shooter by pointing out that even though Derek was closer to the shooter on the night of the shooting, he could not identify anyone. In response, the prosecutor's comment – that Derek was a "piece of work" – was a reference to Derek's refusal to admit he had previously identified Servin as the man who sideswiped his car on the night before Miklo's shooting even though he had done so before the grand jury. The prosecutor's comments about Mendelson were also responsive to defense counsel's closing argument, where he told the jury to find Servin innocent if they "believed [the defense] witnesses" who were "subpoenaed to tell the truth" and said Michelle's car was in the shop and Servin was at Mendelson's house on the night of the shooting. The prosecutor's characterization of Mendelson as a man who went from "Mr. Responsible" to Mr. "I'm too busy to help out my buddy" was a reasonable comment based on Mendelson's testimony that he encouraged Servin to stay over at his house on the night of the shooting because he did not want him to drive intoxicated yet never bothered to contact the police

or anyone else after Servin was arrested to let them know Servin was at his house the night of the shooting, claiming he was too "busy with [his] own life."

¶ 114   Even if any of the prosecutor's comments were improper, none warrant reversal under plain error review, especially where the trial court instructed the jury that closing statements are not evidence and that arguments not supported by the evidence should be disregarded. See *People v. Boston,* 2018 IL App (1st) 140369, ¶ 103 (quoting *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011) ("[I]mproper arguments can be corrected by proper jury instructions, which carry more weight than the arguments of counsel.").

¶ 115   Moreover, contrary to Servin's characterization of the evidence presented at trial, this was not a close case. The State presented testimony from two eyewitnesses, who positively identified Servin as the shooter on the night of the shooting. They were seated just feet away from Servin at the time of the shooting, and Michelle had seen Servin at least four times before. Their testimony was corroborated by testimony of other witnesses and by the ballistics evidence recovered from the scene. Servin presented no eyewitnesses testimony to undercut their identifications and instead, presented an alibi defense, which the jury quickly rejected, deliberating for less than three hours before finding him guilty. Accordingly, we find no plain error stemming from any alleged prosecutorial misconduct.

¶ 116                               III. CONCLUSION

¶ 117   For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 118   Affirmed.